1           IN THE UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF VIRGINIA (RICHMOND)

2

3
                                    )   Case No. 14-34080-KLP
4        In re                      )   Richmond, Virginia
                                    )
5        RIVER CITY RENAISSANCE, LC,   )
         et al.,                    )
6                                   )   December 18, 2014
                           Debtors.  )   11:31 AM
7                                   )
         _____)

8                        TRANSCRIPT OF HEARING
9        HELD FOR COURT GUIDANCE ON BID PROCEDURES (RE: RELATED
             DOCUMENT(S) [250] ORDER ON MOTION TO APPROVE)
10            BEFORE THE HONORABLE KEITH L. PHILLIPS,
                  UNITED STATES BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20
         Transcription Services:           eScribers
21                                         700 West 192nd Street
                                           Suite #607
22                                         New York, NY 10040
                                           (973) 406-2250
23

24       PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25       TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

1    APPEARANCES:

2    For the Debtors:          ROBERT H. CHAPPELL, III, ESQ.
                               JAMES K. DONALDSON, ESQ.
3                              SPOTTS FAIN PC
                               411 East Franklin Street
4                              Suite 600
                               Richmond, GA 23218
5
     CWCapital Asset          ROBBIN S. RAHMAN, ESQ.
6    Management LLC:          KILPATRICK TOWNSEND & STOCKTON LLP
                               1100 Peachtree Street NE
7                              Suite 2800
                               Atlanta, GA 30309
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT OFFICER:  (Audio begins mid-

2    sentence) -- State of Virginia is now in session.  The

3    Honorable Keith L. Phillips presiding.  Please be seated and

4    come to order.

5        THE CLERK:  River City Renaissance, LC.

6        MR. CHAPPELL:  Good afternoon, Your Honor.

7        THE COURT:  Good afternoon.

8        MR. CHAPPELL:  May it please the Court, Robert

9    Chappell, on behalf of River City Renaissance, LC, and River

10    City Renaissance III, LLC -- or LC, excuse me.

11        First, let me say thank you for agreeing to let us

12    come over.  We're in the midst of the auction sale next door.

13    We need to get a ruling from Your Honor as quickly as we can

14    on an issue so that we can get back and get the sale

15    restarted, and not lose the momentum that --

16        THE COURT:  Okay.

17        MR. CHAPPELL:  -- we've got in the room.  We've hit a

18    point where we, at least, don't think we can agree to what the

19    holders are asking us to do as fiduciaries, and so I want to

20    lay out very quickly the issues that we have and see if we can

21    get some guidance from Your Honor so that we can finalize the

22    term of the contract and get the sale going again.

23        In the bid package that we have for bidders, there is

24    a form contract of sale that each bidder must fill out and

25    return, along with his or her or its deposit, and that is the

Colloquy                                                                    4

1   contract that will bind the bidder to purchase the property

2   subject to any increases that they may enter at the auction.

3          And the contract provides that for noncredit-bid

4   bidders, other than the holders, they have to put five percent

5   down in order to get in the door, and then if they fail to

6   execute that contract -- if they fail to sign the contract,

7   it's forfeit.  Within twenty-four --

8          THE COURT:  What's forfeit, the --

9          MR. CHAPPELL:  The five percent, so in order -- let's

10  say you put in a bid for a dollar.  You have to post a nickel

11  with Fidelity National Title, in escrow, in order to get in

12  the door at the sale, okay?  Then if you fail -- if you're the

13  high bidder, and fail to close --

14         THE COURT:  Oh, if you breach the contract, then you

15  forfeit the deposit?

16         MR. CHAPPELL:  Right.

17         THE COURT:  Okay.

18         MR. CHAPPELL:  And if you sign the contract, you have

19  twenty-four hours to raise your bid to ten percent.  If you

20  don't -- your deposit to ten percent.  So let's say that you

21  bid -- your bid is a dollar.  You put up a nickel; you're the

22  high bidder.  Within twenty-four hours from the conclusion of

23  the auction, you now have to have a dime in escrow to protect

24  the estate in the event you fail to close.

25         THE COURT:  And if you don't do that, you lose your

1  nickel?

2          MR. CHAPPELL:  That is correct, and then we go to the

3  backup bidder.

4          THE COURT:  Okay.

5          MR. CHAPPELL:  And so -- but the issue here is that,

6  I think appropriately, under the credit bid order, the holders

7  do not have to put up a deposit.  There's no requirement for

8  deposit, unless they bid in excess of their debt amount.

9  Okay?

10          THE COURT:  And then is a deposit required?

11          MR. CHAPPELL:  And then there would be a deposit

12  required, up to --

13          THE COURT:  Five percent of the excess?

14          MR. CHAPPELL:  Ten percent of the excess would be

15  what would be required.  But the issue here is what happens if

16  the holders are the high bidders, within their credit limit,

17  and then they default?  And the reason it's important is that

18  they have told us they are contemplating, if they are the high

19  bidder, not closing, but seeking instead to breach the

20  contract and file a motion for relief from stay in order to be

21  able to foreclose, instead of closing on the credit bid that

22  they've submitted.

23          And in negotiating that, the provisions, what we

24  proposed, and what they -- at least, I think -- agree to a

25  point, is that the contracts say that if they default, the

Colloquy                                                                6

1   contract's terminated and the estate has all of the rights and
2   remedies that a seller to a defaulted real estate contract
3   would have under applicable law.
4         But they want to add, in addition to that, a
5   provision that says unless the court orders otherwise for
6   cause, which we agreed to.  They also wanted to add something
7   about -- including if they file a motion for relief from stay.
8   Beyond that, they've asked us to agree that in the event they
9   breach the contract, the damages that the estate could seek
10  from them are capped at the amount of their claim.
11        And our concern is not knowing what could happen in
12  this case as we go down the road, as we go through the claim
13  objection, that as a fiduciary, we cannot agree to put a cap
14  on their damages, when we know going in that they are
15  contemplating breaching the contract that they're going to
16  enter into this afternoon if they're the high bidder.
17        And so really, I think the issue, Your Honor, is
18  this:  should the contract that they sign as the high bidder
19  include a provision that limits their liability for breach to
20  the amount of their claim?
21        THE COURT:  Which is twenty-six or twenty-eight
22  million or something in the one case and --
23        MR. CHAPPELL:  It's -- in the larger case it's
24  approximately 31.3 million dollars -- 31.3 to 31.4 million
25  dollars, and in the smaller case it is 6.6 -- excuse me, Your

Colloquy                                                                    7

1    Honor.  Actually, yeah, it's approximately 6.6 to 6.7, and

2    so --

3            THE COURT:  So they're asking that the -- that their

4    damages be limited to that amount.

5            MR. CHAPPELL:  That's correct, the amount of --

6            THE COURT:  And your concern is that your claim could

7    be higher than that amount?

8            MR. CHAPPELL:  Well, first of all, we don't know

9    whether that will end up being the amount of their claim or

10   not.  There's a pending claim objection, there's discovery

11   ongoing.

12           Second of all, we don't know what other claims we may

13   have, but we're -- as a fiduciary, we're dealing with a party

14   that's credit bidding, and that has alerted us that it is

15   actively considering breaching the contract that it signs.

16           And under those circumstances, it strikes us, as a

17   fiduciary, that it would be extremely unwise to agree to a

18   limitation on their liability if we know they're contemplating

19   breaching the contract.

20           THE COURT:  Well, what if you don't agree?  What does

21   that do?

22           MR. CHAPPELL:  Well, I'm -- well, our first answer

23   was to come to Your Honor and ask the Court, do we include

24   that provision in the contract or not?  I think if Your Honor

25   can't rule, won't rule, then I think we have -- we'll have to

Colloquy                                                                          8

1    decide whether we allow them to come into the auction -- what

2    we do.

3           It puts us in a real fix because we've been through

4    the individual properties.  We're holding them open while

5    we're waiting to do the entireties.  It's in the entireties

6    that they want to bid.  We have three parties, other than the

7    holders, with hard money down who are entireties bidders on

8    the big portfolio.  And we have at least three on the small

9    portfolio.

10          But representing the creditors of the estate, we are

11   very concerned about agreeing to a cap on damages with a party

12   we know is contemplating breach.  We don't think it's

13   appropriate, we don't think it was provided for in the sale

14   order, and we think that agreeing that we have the remedies

15   that we have under law for breach, unless Your Honor orders

16   otherwise, gives them ample protection.

17          THE COURT:  Well, you're negotiating certain terms in

18   the contract in connection with the credit bid --

19          MR. CHAPPELL:  That's correct.

20          THE COURT:  -- that go beyond the scope of the sale

21   order and the order approving the credit bid.

22          MR. CHAPPELL:  That's correct.

23          THE COURT:  And some of those provisions you do want

24   to include.

25          MR. CHAPPELL:  We are willing to include -- I mean,

1    we think ordinarily if you bid on a piece of property at

2    auction and then you default, you're liable for damages.  I

3    mean, that's just the --

4            THE COURT:  Right, but I mean I guess what I'm

5    wondering is why does there have to be additional negotiation?

6    Why can't you use the contract that is already in place?

7            MR. CHAPPELL:  The reason is because the contract

8    that's in place call -- provides that bidders post a deposit

9    and that they forfeit their deposit as their damages.  And

10   those are bidders who are strangers to the contract between

11   the debtors and the holder.

12           And we're inviting them in to bid on this.  And we

13   put a pretty onerous requirement that you put a five-percent

14   bid in to get in the door, and you increase it to ten percent

15   by the time -- within twenty-four hours of being the high

16   bidder.  Now, that's putting a lot of money at risk.

17           THE COURT:  But their claim is, under any

18   circumstance, it's going to be more than ten percent of their

19   bid, right?  I mean, why do they have to put any cash at all

20   in if they're owed twenty million --

21           MR. CHAPPELL:  We're not asking them to put any cash

22   in.  Okay?  And just to be clear, we are simply saying that if

23   they breach, we have the ability, should we choose to, to seek

24   whatever remedies under law any seller to a defaulted real

25   estate contract might have.

1          THE COURT:  That's already in place, right?  Isn't

2   that --

3          MR. CHAPPELL:  That's in place, but they want the

4   additional backside protection that among those remedies we

5   have, whatever they are, that there is a cap in the amount of

6   their debt for --

7          THE COURT:  Well, if you say no, how does that -- why

8   do you need to even change the terms of the existing contract?

9          MR. CHAPPELL:  We don't think we do, but

10  we're -- we've been trying to resolve this issue all morning.

11         THE COURT:  You're just trying to accommodate the

12  holder?  Is that --

13         MR. CHAPPELL:  Well, we're trying to reach a position

14  where we can go forward with the auction.  They want to have

15  one term in their bid.  We want to exclude it, and we've come

16  to the Court to try and get the Court's --

17         THE COURT:  But if you say I'm not going beyond

18  what's already in place, you got to use the same contract that

19  everybody else uses, why can't they do that?  Why would they

20  be entitled to some special consideration under the terms of

21  the agreement?

22         MR. CHAPPELL:  I'm not sure they are.  The issue,

23  however, is -- and maybe I'm not understanding.

24         THE COURT:  I mean, if another bidder came in and

25  said I'm making a bid but I want a cap on whatever damages you

1    might have in connection with my potential breach, you're

2    going to say, well, no.  This is the contract.  Sign it or

3    not.  If you don't sign it, you don't get to bid.  Isn't

4    that --

5              MR. CHAPPELL:  I mean, that is an option and we may

6    come to that.  I think the issue is with everybody else,

7    everyone else is a stranger to the debtors.  And they have put

8    up hard money, five percent of their bid, and then they have

9    to put up another five percent of their final bid to protect

10   the estate.  But none of them have told us that they are

11   contemplating breach of the bid they're putting in.

12             THE COURT:  Well, none of them have asked for a cap

13   on damages either, right?

14             MR. CHAPPELL:  No, they have not.

15             THE COURT:  So I don't understand why you would say

16   to one bidder that you can have a cap -- or why you would even

17   consider that.

18             MR. CHAPPELL:  We're opposed to it.  They're

19   insisting on it.  And so we came over here to seek the

20   guidance of the Court.

21             THE COURT:  Well, okay, maybe there's a reason Mr.

22   Rahman can tell me.

23             MR. RAHMAN:  Your Honor, there are several reasons,

24   and first let me first thank you for hearing us on such short

25   notice, and also apologize that we asked to be heard on such

1   short notice.

2          THE COURT:  That's fine; I'm happy to do what I can

3   to assist the process.

4          MR. RAHMAN:  We're not asking for special treatment,

5   Your Honor.  And I also want to -- after I've spoken about

6   this first issue, talk about the breach issue, because I think

7   that completely mischaracterizes the way that would be

8   presented to Your Honor.  There's no breach situation here,

9   but I'll talk about that in a moment.

10          First, we're not asking for special treatment.  The

11   credit bid order that Your Honor entered sets forth the

12   procedures under which we submit our credit bid, and it says,

13   "A holder may submit an allowed credit bid that's for the

14   acquisition of prospective properties or any portions thereof

15   that serve as the holder's collateral, in accordance with the

16   terms of this order, the sale and bid procedures order, and

17   the procedures", which is the procedures themselves.

18          If you go to the actual procedures, the requirements

19   are basically that you have an initial deposit, which we've

20   been excepted from, and the debtors acknowledge that; you

21   identify the properties, which we've done; you have no

22   contingencies in your sale agreement, which we don't; a

23   blackline agreement, which Mr. Chappell has, and it's

24   irrevocable; and we do it by the bid -- we've done all of

25   those things.

Colloquy                                                              13

1            Other bidders have submitted APAs that have

2    blacklines, and they've basically stripped part -- stricken

3    parts they don't like and added parts they do.  Mr. Chappell

4    and I had discussions about some of the other bidders and why

5    they put provisions in that they liked or didn't like.

6            It's a negotiation with every single bidder.  This is

7    not -- this is nothing special.  The reason it's important to

8    us, Your Honor, is as Your Honor recognized, the limitation

9    for all the other bidders on their liability is the five-

10   percent deposit, or if they're the high bidder, the ten-

11   percent deposit.

12           There's no circumstance for any other bidder where

13   they would be liable for just unlimited damages.  It's

14   especially a hard issue for us because of the contract that we

15   have with the trust, which prohibits us from exposing them to

16   simply unlimited damages.  We just -- we can't do that.  But

17   the point is --

18           THE COURT:  So you would be singled out by being

19   exposed to unlimited damages when no other purchaser would be?

20           MR. RAHMAN:  That's correct; that's correct, Your

21   Honor.  We have --

22           THE COURT:  I mean, it seems to me that you should be

23   treated the same.  The only difference --

24           MR. RAHMAN:  And every --

25           THE COURT:  -- being that you're not putting cash up

Colloquy                                                                    14

 1   because you have the right to credit bid.

 2              MR. RAHMAN:  And let me just say, every bidder that

 3   showed up today had the opportunity to mark up the APA and

 4   submit the version they wanted.  And the only restriction --

 5              THE COURT:  Well, the terms that they're -- I mean, I

 6   would assume they aren't very material terms that they're

 7   deviating.

 8              MR. RAHMAN:  I've not reviewed them closely, but I

 9   don't know that that's a hundred percent accurate.  I think

10   there are some terms that were pretty relevant that I believe

11   Mr. Chappell had to go back to them and discuss with them.

12              THE COURT:  They would need to be consistent with the

13   orders that have been entered.

14              MR. RAHMAN:  Of course.

15              THE COURT:  I mean, obviously, a trustee can make

16   changes that don't really change the material terms of the

17   sale.

18              MR. RAHMAN:  I think that's correct, but the way we

19   have viewed the APA -- and I think it's sort of the way we've

20   discussed it -- it's largely a gatekeeping function and to

21   bind the other party to be the high bidder and actually close

22   the sale, should they reach that point.  The terms that are in

23   there is not actually -- maybe in some instances that would be

24   the actual agreement, but I expect there will be some more

25   give and take before you get to the actual closing.

Colloquy                                                    15

1          I mean, just as an example, our bid was submitted
2     with a clear indication that we could assign this to another
3     party because we will have to establish a special-purpose
4     vehicle to actually close the sale.  So that -- right there,
5     it'll be a different purchaser if we're the high bidder.
6          My point in bringing all this up is that it's all
7     subject to negotiation.  It's completely contemplated by the
8     sale procedures.  What we did now is nothing different.  The
9     fact that they don't like the provision that we put in
10    there -- I mean, it's not anything unusual.  And none of the
11    other bidders are going to be subject to an unlimited amount
12    of damages.
13         And the fact that we have -- and I can tell Your
14    Honor exact what it says in your order, but we have
15    $27,621,781.83 as an undisputed portion of our claim.  And if
16    damages cannot be satisfied, at least by that amount, then I
17    guess I'm wondering what sort of damages could possibly arise
18    that would eat through that entire claim.
19         THE COURT:  And that's likely to be considerably more
20    than what a third-party purchaser -- another unrelated
21    purchaser might be subject to, because they're limited to the
22    ten percent.
23         MR. RAHMAN:  To the ten percent, correct.  Now, just
24    to speak to the second issue, which is the breach, Your Honor,
25    that is a complete mischaracterization of what actually would

Colloquy                                                                      16

1    happen.

2           From the very beginning we have told Mr. Chappell

3    that it is our desire, should the facts arise, to immediately

4    file a motion for relief from stay.  I think the very first

5    hearing that I came before Your Honor, I actually raised that

6    possibility and said we may very quickly file a motion for

7    relief from stay, because we don't believe this process is

8    going to yield the types of upside that the debtors believe

9    will come out of it.

10          We still believe that; having sat in that auction

11   today, and seen what's happening, we still believe that.

12   Nonetheless -- and we raised that issue with Mr. Chappell

13   again last week when the bids came in and they clearly were

14   not enough to satisfy our debt -- we told him we may file a

15   stay relief motion this week in advance of the auction.

16          And he was very clear that that was not something the

17   debtors wanted us to do.  So we were very cooperative.  That's

18   fine, we'll hold off until after the auction, but understand

19   that we may still want that flexibility that if it's in the

20   best interests of our client to -- rather than close the sale

21   should we be the high bidder, if it's better for us to

22   actually seek stay relief and then foreclose, then we want the

23   flexibility to do that.

24          Mr. Chappell was noncommittal on that.  He did not

25   say one way or the other whether the debtors would agree with

Colloquy                                                                      17

1    that, and we understood that they may have a different

2    position.  But nonetheless, we shared that with them.

3          And the way that this would come before Your Honor is

4    if we're the high bidder, there's a -- the motion is pending,

5    and the hearing would be held for approval of the sale on the

6    23rd, and we would come before Your Honor and say look,

7    presumably tomorrow or Monday we have filed a stay relief

8    motion because we were the high bidder, but we don't want to

9    close the sale.

10         And Mr. Chappell would have the opportunity to say

11   why it's better to go through with the sale.  We'd have the

12   opportunity to tell you why we shouldn't do it, why it makes

13   no sense for any of the parties, why it's less expensive, why

14   it's more streamlined, et cetera, et cetera, et cetera.  So in

15   that circumstance, it's not a breach, because the closing is

16   not until sometime in January.  So just to characterize it as

17   an anticipatory breach is completely incorrect and is not how

18   that would come before Your Honor.

19         THE COURT:  Well, it certainly wouldn't be -- I mean

20   based on what you're telling me now, there's no anticipatory

21   breach.

22         MR. RAHMAN:  No, Your Honor, we do not know for

23   certain --

24         THE COURT:  If you filed a motion for relief of stay,

25   that might be interpreted potentially as something, but that

Colloquy                                                    18

1   hasn't happened.

2           MR. RAHMAN:  Yeah, that doesn't automatically mean

3   we've breached the sale -- the sale order or any of the

4   procedures.  That simply means that we're asking Your Honor

5   for relief on -- I mean, you could grant stay relief --

6           THE COURT:  Well, it hasn't happened at this point.

7           MR. RAHMAN:  -- and we could still close.

8           THE COURT:  So I --

9           MR. RAHMAN:  I mean --

10          THE COURT:  The question now is that -- are the

11  holders going to be capped -- am I going to approve a contract

12  or a potential contract which caps the damages to the amount

13  of the claim.

14          MR. RAHMAN:  That's correct, Your Honor.

15          THE COURT:  Which is considerably more than the ten

16  percent that other bidders are potentially facing if they

17  breach the contract.

18          MR. RAHMAN:  That's correct, Your Honor.

19          THE COURT:  All right, okay, thank you.

20          MR. RAHMAN:  Thank you.

21          THE COURT:  Mr. Chappell, are you doing this because

22  you need a comfort order of some type?  Is this because -- or

23  is it really because you feel that there's a potential that

24  the damages could exceed the amount of the claims, or that the

25  holders should be subject to greater damages than any other

1    bidder?

2              MR. CHAPPELL:  I think, Your Honor, just to be blunt,

3    we don't know what claims we would have.  But I think there is

4    no question that they intend to enter into a contract with the

5    estate for the purchase of this property if they're the high

6    bidder.  And they have acknowledged on the record that they

7    are considering filing a motion and seeking to get out of that

8    very contract.

9              I think that is arguably bad faith.  And so there

10   could easily be damage claims that exceed the amount,

11   depending on what bids we lose and what happens in the

12   interim, and so the answer is both, Your Honor.

13             I can't sit here and tell you exactly what claims we

14   have, because I don't know.  But as a fiduciary, when I

15   have -- I'm negotiating with a party, as the order says -- the

16   order says, "Any bid submitted by holder shall be in form

17   substantially similar to the form purchase agreement as

18   defined in the procedures as may be agreed to by the debtors

19   and the holders."

20             THE COURT:  Which with respect to other bidders,

21   limits the damages to ten percent.

22             MR. CHAPPELL:  That is correct, but they also don't

23   have credit bid rights, and they haven't told us that they are

24   considering filing a motion to get out of the bid they're

25   going to enter this afternoon.

1          THE COURT:  Well, if the damages are capped, they're

2     only capped in connection with the breach of this contract.

3          MR. CHAPPELL:  That's correct.

4          THE COURT:  I mean, there's no release contemplated

5     for any other claims that the estate may have against the

6     holders.

7          MR. CHAPPELL:  That's correct, and I do -- I just

8     want to clarify one other point.

9          THE COURT:  I mean, I wanted to be clear about that

10    too, is that --

11         MR. CHAPPELL:  That's correct, they're asking for a

12    cap on the damages resulting from the breach of the contract.

13    That's all they're asking for, but we think it's a lot.

14         The other point about the negotiations, we have one

15    other party.  It is a material institutional investor that has

16    spent a lot of time doing due diligence that has requested

17    some changes to the form of the agreement.  We do not believe

18    they are material.  We don't think they impair the estate in

19    any way or we wouldn't have agreed to them.  But it's not true

20    that every one of the bidders over in that ballroom waiting

21    for us to get back there has come in and negotiated every

22    aspect.

23         THE COURT:  Well, I mean, I would think that

24    any -- in this much of a complicated transaction, there'll be

25    some deviations of the APA from whatever form you may have

Colloquy                                                          21

1   submitted, but that if they were significant enough, you would

2   be here, as you are now, asking for some type of guidance or

3   permission to --

4           MR. CHAPPELL:  Yeah.

5           THE COURT:  But I guess what I'm struggling with is

6   why the credit bidder or the holder, who's willing to increase

7   the potential damages above what other bidders might be

8   subject to, which is ten percent, why that -- and I understand

9   you were saying well, because they've already signaled a

10  possibility they may breach the contract.

11          Nevertheless, I mean, maybe there's some other

12  bidders who may be contemplating potentially forfeiting

13  deposits or bid or -- and they just didn't make the mistake of

14  telling you what they were thinking.  But they haven't done

15  anything at this point.  There's no evidence that they're

16  going into this in bad faith with a clear intention of not

17  going through with the sale.

18          MR. CHAPPELL:  That's right; we have no other bidders

19  who have told us they are contemplating not performing on the

20  contract they enter into today.  But that, to us, is a very

21  special circumstance, particularly when you're running an

22  auction and you put the expense and time and effort into

23  bringing the auction off.

24          And then you've got a party that's fought very hard,

25  and caused the estate to expend tens of thousands of dollars

1   to get these credit bid rights, that's now looking at maybe

2   exercising the rights at bidding, but then trying to get out

3   of them.  That is not the kind of scenario where we felt as a

4   fiduciary we could just say yeah, that's okay.

5           THE COURT:  Well, I understand that, and I understand

6   why the trustee would feel more comfortable with an order that

7   approves whatever you're contemplating with the holders.  But

8   I guess I don't see where it's gone far enough, at this point,

9   where you actually have tangible evidence that they are

10  entering into a contract that they full intend not to go

11  forward with, or that they've indicated that they don't

12  intend -- they they're going into it in bad faith.

13          I'm hearing that there's a possibility that they may

14  have other strategies, and some -- does it somehow have an

15  effect on the sale that this -- is it somehow chilling

16  potential offers from other bidders?

17          MR. CHAPPELL:  Well, I don't think we know.  I don't

18  think we know.  I mean, I do think that whatever we do, we

19  just need to make a decision now and then get back to the

20  sale.

21          THE COURT:  Yeah, because I don't see how, you know,

22  if you limit the holders -- the estate's claim for damages

23  against the holders to the amount of their claim, how that

24  would somehow affect other bidders' intentions to potentially

25  offer more, which is to me a --

Colloquy                                                    23

1          MR. CHAPPELL:  I'm not sure -- I can't argue to you

2    how it would, Your Honor.  Because I don't think that other

3    bidders are going to know about it.  I don't think we're going

4    to go in and announce to them that the holders are here, and

5    they're bidding, but they've told us they may back out.  We're

6    not going to do that.  So they're not going to know, but it is

7    deeply concerning to us to know that we have a party bidding

8    that is signaling it may be looking to get out of its bid.

9          THE COURT:  Well, I understand that, but the

10   issue -- and Mr. Donaldson wants to talk to you.

11         MR. CHAPPELL:  Oh, I'm sorry.

12         MR. DONALDSON:  Excuse me, Your Honor.

13         MR. CHAPPELL:  The other point that I think Mr.

14   Donaldson and Mr. Luzinski want to raise is that with a third

15   party, they put up five and then ten percent, and then if they

16   breach, that actually becomes in a way a windfall to the

17   estate, because we still have the -- we still have the ability

18   to resell the property, plus we have that bonus money.  I

19   mean, it's in hand.  It is at Fidelity.  It comes into the

20   estate.  It's not subject to any liens.  It is money that is

21   available to pay creditors.  Whereas here we have to go and

22   try and beat the money out of them.  So I do think --

23         THE COURT:  Well, I see that difference too, and

24   that's what I thought -- where you were heading to begin with,

25   was they're not putting up cash.  They're just putting up a

1  setoff or something.  And the estate may have independent

2  claim to those funds, and is the setoff appropriate and so

3  forth.

4          And I mean, I certainly think if there's a breach,

5  that that obligation is separate from -- the forfeiture

6  potentially of ten percent of whatever would be separate from

7  the secured claim that they have.

8          MR. CHAPPELL:  Yeah.

9          THE COURT:  Whether it could be offset or not, I

10 don't know, but -- and how the estate could collect that or

11 could there be an accounting.  That's not before me at this

12 point, and certainly something you might want to consider.

13          But once again, it comes back to the question is the

14 difference between the contract that other bidders are being

15 asked to sign and the contract that the holder's being asked

16 to sign is that the holder wants to limit its damages to the

17 amount of its claim, which seems to me, under any

18 circumstances, to be way in excess of the ten-percent cap that

19 the other bidders might forfeit.

20          And so from that standpoint -- I can't say that I

21 wouldn't, if I were the trustee, be concerned about the

22 possibility that -- the signal that there may be a breach

23 would bother me.  It probably would, but I don't know that the

24 holders have gone so far as to make that -- that they clearly

25 indicated that's their intent to do that.  It's what they're

Colloquy                                                                              25

1  thinking they might consider, and I'm sure they'll consider

2  all of the factors.  And had they never said anything about

3  it, they could still do that if they were the high bidder.

4          MR. CHAPPELL:  That's correct.  That's correct.

5          THE COURT:  So it's still --

6          MR. CHAPPELL:  But it puts us in a difficult spot.

7  And the other thing is if another party breaches, their money

8  is good.  We take it.  We resell the property.  We don't have

9  the expense of filing suit, dealing -- having to -- dealing

10  with a contested suit, having to collect.

11          THE COURT:  Right.

12          MR. CHAPPELL:  So -- but at the end of the day, I

13  think we just need to -- at the end of the day we need --

14          THE COURT:  Well, I see the problem there, and that

15  may be something that should have been brought up in

16  connection with the approval of the credit bid, would there be

17  a separate requirement of a deposit, there could be setoff

18  rights.  I don't know.  I think we're too far past that, at

19  this point.

20          MR. CHAPPELL:  Oh, we are.

21          THE COURT:  So I think it still comes back to -- if

22  the holders were saying we want to be limited to ten percent

23  just like everybody else, that's the most you could possibly

24  get from us, then I'd see where that would be a more difficult

25  question for me.  But when they're offering to have their

1   damages capped at the twenty-six or thirty-one-whatever

2   million and six million, that seems like a pretty good

3   offer --

4           MR. CHAPPELL:  Okay.

5           THE COURT:  -- when the damages could be considerably

6   more than the ten percent.  Better than what you're getting

7   from other bidders.

8           MR. CHAPPELL:  Understanding if that's the Court's

9   ruling, we'll run with it and go back --

10          THE COURT:  Well, if I may that ruling, you have an

11  order that protects the trustee at least for agreeing to these

12  terms.  And you can continue with the sale, and I don't see

13  where that --

14          MR. CHAPPELL:  Yeah.

15          THE COURT:  -- chills the sale.

16          MR. CHAPPELL:  It doesn't chill the sale.  I agree.

17  No one at the sale is going to know about it.

18          THE COURT:  So I think what it comes down to is

19  there's just the holders are thinking out loud, and what they

20  may choose to do may or may not happen.  But they haven't

21  signaled a clear intent to do that.  Certainly, there's no

22  evidence before me that that's what they're going to do.

23          So I don't think it's appropriate for me to use that

24  thinking-out-loud process to require some type of unlimited

25  damages cap, as opposed to what appears to be a pretty

Colloquy                                                          27

1   significant cap in comparison to what other bidders might have

2   to make.

3           MR. CHAPPELL:  Okay.

4           THE COURT:  So I think in the interest of getting

5   this sale completed, and I hope that there's a third party

6   that bids considerably more than what the holders are owed,

7   and that it doesn't turn out to be an issue.

8           MR. CHAPPELL:  We do too, Your Honor.

9           THE COURT:  I'm going to, in this case, agree that

10  it's -- I think it's appropriate to cap the damages for the

11  breach of contract -- not any other potential claims that the

12  trustee may have against the holders -- at the amounts of

13  their claims.

14          MR. CHAPPELL:  Okay, thank you, Your Honor.  Thank

15  you very much for hearing us.  We appreciate it, and --

16          THE COURT:  Now, there's no written motion before the

17  Court.  Does the --

18          MR. CHAPPELL:  I think -- are we good here?

19          MR. RAHMAN:  Yeah, I don't know that we need a

20  written motion, unless Your Honor requires that.

21          THE COURT:  Well, do you need an order --

22          MR. RAHMAN:  I'm comfortable.

23          THE COURT:  -- is what I'm getting at?

24          MR. RAHMAN:  I don't think so, Your Honor.

25          MR. CHAPPELL:  We're fine to proceed with the sale.

1    This is what we needed.  I think we have the language in the

2    e-mails that we've been exchanging.

3            MR. RAHMAN:  Correct.

4            MR. CHAPPELL:  So we're -- with Your Honor's ruling,

5    we're now ready to --

6            THE COURT:  There's no potential --

7            MR. CHAPPELL:  -- go back to the sale.

8            THE COURT:  -- appeal of this particular issue, but

9    this is on the record.  So to the extent that somebody might

10   complain --

11           MR. CHAPPELL:  I don't believe we will, if it's --

12           THE COURT:  Or that somebody accuses the trustee of

13   not following his fiduciary duties in agreeing to that, you're

14   straight.

15           MR. RAHMAN:  If we take twenty seconds, Your Honor, I

16   just want to -- because there's a couple e-mails --

17           THE COURT:  Sure.

18           MR. RAHMAN:  -- floating around.  I want to make sure

19   we're talking about the same language.

20           MR. CHAPPELL:  Your Honor, I think we have what we

21   need, and again thank you very much for allowing us to come --

22           THE COURT:  I'm happy to do it.

23           MR. CHAPPELL:  -- over.

24           THE COURT:  If you need any more, just contact my

25   clerk.  I'm pretty much available.  The hearing that you have

1  scheduled for the 23rd?

2         MR. CHAPPELL:  Yes, Your Honor.

3         THE COURT:  The docket reflects that there is a cash

4  collateral hearing.  Is that something you anticipate just

5  having resolved until after the sale?

6         MR. CHAPPELL:  I hope so.  Where we are is the cash

7  collateral expires on 12/31.  We've prepared a budget in

8  keeping with the prior budgets, and incorporating the basic

9  adequate protection payment provisions in the last order that

10 was entered, that would carry it through the end of the month

11 of January, but subject to termination upon closing of sales.

12        Mr. Rahman has told me that they want to see what

13 happens at the auction before determining how they will

14 respond to that motion.

15        THE COURT:  So it's too soon.

16        MR. CHAPPELL:  Yes, Your Honor.

17        THE COURT:  As far as the sale is concerned, remind

18 me what is supposed to happen on the 23rd?

19        MR. CHAPPELL:  So tomorrow, assuming -- I think

20 tomorrow we would probably be filing a motion to approve the

21 sale of the properties, the assumption and assignment of the

22 leases, that would go out to the core parties --

23        THE COURT:  To the high bidder.

24        MR. CHAPPELL:  -- and then we would be before Your

25 Honor on the 23rd to seek approval of the contract or

1   contracts for the sale of the property.

2          THE COURT:  Okay, all right, well, that sounds good.

3   Like I said, if you need any further guidance, I'm readily

4   available.

5          MR. CHAPPELL:  Okay, I think this will be it.  But

6   thank you, Your Honor.

7          THE COURT:  All right, thank you.

8          MR. RAHMAN:  Thank you, Your Honor.

9          THE COURT OFFICER:  All rise.  The Court is now

10  adjourned.

11     (Whereupon these proceedings were concluded at 12:34 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T I O N

2

3            I, Tamara Bentzur, the court approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8

9                                         December 22, 2014

10   _____      _____

11   TAMARA BENTZUR                        DATE

12   AAERT Certified Electronic Transcriber CET**D 824

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$27,621,781.83 (1)**
15:15

## A

**ability (2)**
9:23;23:17
**able (1)**
5:21
**above (1)**
21:7
**accommodate (1)**
10:11
**accordance (1)**
12:15
**accounting (1)**
24:11
**accurate (1)**
14:9
**accuses (1)**
28:12
**acknowledge (1)**
12:20
**acknowledged (1)**
19:6
**acquisition (1)**
12:14
**actively (1)**
7:15
**actual (3)**
12:18;14:24,25
**Actually (9)**
7:1;14:21,23;15:4,
25;16:5,22;22:9;
23:16
**add (2)**
6:4,6
**added (1)**
13:3
**addition (1)**
6:4
**additional (2)**
9:5;10:4
**adequate (1)**
29:9
**adjourned (1)**
30:10
**advance (1)**
16:15
**affect (1)**
22:24
**afternoon (4)**
3:6,7;6:16;19:25
**again (4)**
3:22;16:13;24:13;
28:21
**against (3)**
20:5;22:23;27:12
**agree (9)**
3:18;5:24;6:8,13;

## 7:17,20;16:25; 26:16;27:9

**agreed (3)**
6:6;19:18;20:19
**agreeing (5)**
3:11;8:11,14;
26:11;28:13
**agreement (6)**
10:21;12:22,23;
14:24;19:17;20:17
**alerted (1)**
7:14
**allow (1)**
8:1
**allowed (1)**
12:13
**allowing (1)**
28:21
**along (1)**
3:25
**among (1)**
10:4
**amount (15)**
5:8;6:10,20;7:4,5,
7,9;10:5;15:11,16;
18:12,24;19:10;
22:23;24:17
**amounts (1)**
27:12
**ample (1)**
8:16
**announce (1)**
23:4
**anticipate (1)**
29:4
**anticipatory (2)**
17:17,20
**APA (3)**
14:3,19;20:25
**APAs (1)**
13:1
**apologize (1)**
11:25
**appeal (1)**
28:8
**appears (1)**
26:25
**applicable (1)**
6:3
**appreciate (1)**
27:15
**appropriate (4)**
8:13;24:2;26:23;
27:10
**appropriately (1)**
5:6
**approval (3)**
17:5;25:16;29:25
**approve (2)**
18:11;29:20
**approves (1)**
22:7
**approving (1)**

## 8:21

**approximately (2)**
6:24;7:1
**arguably (1)**
19:9
**argue (1)**
23:1
**arise (2)**
15:17;16:3
**around (1)**
28:18
**aspect (1)**
20:22
**assign (1)**
15:2
**assignment (1)**
29:21
**assist (1)**
12:3
**assume (1)**
14:6
**assuming (1)**
29:19
**assumption (1)**
29:21
**auction (12)**
3:12;4:2,23;8:1;
9:2;10:14;16:10,15,
18;21:22,23;29:13
**Audio (1)**
3:1
**automatically (1)**
18:2
**available (3)**
23:21;28:25;30:4

## B

**back (9)**
3:14;14:11;20:21;
22:19;23:5;24:13;
25:21;26:9;28:7
**backside (1)**
10:4
**backup (1)**
5:3
**bad (3)**
19:9;21:16;22:12
**ballroom (1)**
20:20
**based (1)**
17:20
**basic (1)**
29:8
**basically (2)**
12:19;13:2
**beat (1)**
23:22
**becomes (1)**
23:16
**begin (1)**
23:24
**beginning (1)**

## 16:2

**begins (1)**
3:1
**behalf (1)**
3:9
**best (1)**
16:20
**better (3)**
16:21;17:11;26:6
**Beyond (3)**
6:8;8:20;10:17
**bid (35)**
3:23;4:10,19,21,
21;5:6,8,21;8:6,18,
21;9:1,12,14,19;
10:15,25;11:3,8,9,
11;12:11,12,13,16,
24;14:1;15:1;19:16,
23,24;21:13;22:1;
23:8;25:16
**bidder (25)**
3:24;4:1,13,22;
5:3,19;6:16,18;9:16;
10:24;11:16;13:6,10,
12;14:2,21;15:5;
16:21;17:4,8;19:1,6;
21:6;25:3;29:23
**bidders (22)**
3:23;4:4;5:16;8:7;
9:8,10;13:1,4,9;
15:11;18:16;19:20;
20:20;21:7,12,18;
22:16;23:3;24:14,
19;26:7;27:1
**bidders' (1)**
22:24
**bidding (4)**
7:14;22:2;23:5,7
**bids (3)**
16:13;19:11;27:6
**big (1)**
8:8
**bind (2)**
4:1;14:21
**blackline (1)**
12:23
**blacklines (1)**
13:2
**blunt (1)**
19:2
**bonus (1)**
23:18
**both (1)**
19:12
**bother (1)**
24:23
**breach (23)**
4:14;5:19;6:9,19;
8:12,15;9:23;11:1,
11;12:6,8;15:24;
17:15,17,21;18:17;
20:2,12;21:10;
23:16;24:4,22;27:11

## 16:2 (col 5)

**breached (1)**
18:3
**breaches (1)**
25:7
**breaching (3)**
6:15;7:15,19
**bringing (2)**
15:6;21:23
**brought (1)**
25:15
**budget (1)**
29:7
**budgets (1)**
29:8

## C

**call (1)**
9:8
**came (4)**
10:24;11:19;16:5,
13
**can (12)**
3:13,14,18,20,21;
10:14;11:16,22;
12:2;14:15;15:13;
26:12
**cap (11)**
6:13;8:11;10:5,25;
11:12,16;20:12;
24:18;26:25;27:1,10
**capped (5)**
6:10;18:11;20:1,2;
26:1
**caps (1)**
18:12
**carry (1)**
29:10
**case (5)**
6:12,22,23,25;27:9
**cash (6)**
9:19,21;13:25;
23:25;29:3,6
**cause (1)**
6:6
**caused (1)**
21:25
**certain (2)**
8:17;17:23
**certainly (4)**
17:19;24:4,12;
26:21
**cetera (3)**
17:14,14,14
**change (2)**
10:8;14:16
**changes (2)**
14:16;20:17
**CHAPPELL (71)**
3:6,8,9,17;4:9,16,
18;5:2,5,11,14;6:23;
7:5,8,22;8:19,22,25;
9:7,21;10:3,9,13,22;

11:5,14,18;12:23;
13:3;14:11;16:2,12,
24;17:10;18:21;
19:2,22;20:3,7,11;
21:4,18;22:17;23:1,
11,13;24:8;25:4,6,
12,20;26:4,8,14,16;
27:3,8,14,18,25;
28:4,7,11,20,23;
29:2,6,16,19,24;30:5
**characterize (1)**
17:16
**chill (1)**
26:16
**chilling (1)**
22:15
**chills (1)**
26:15
**choose (2)**
9:23;26:20
**circumstance (4)**
9:18;13:12;17:15;
21:21
**circumstances (2)**
7:16;24:18
**City (3)**
3:5,9,10
**claim (15)**
6:10,12,20;7:6,9,
10;9:17;15:15,18;
18:13;22:22,23;24:2,
7,17
**claims (8)**
7:12;18:24;19:3,
10,13;20:5;27:11,13
**clarify (1)**
20:8
**clear (6)**
9:22;15:2;16:16;
20:9;21:16;26:21
**clearly (2)**
16:13;24:24
**CLERK (2)**
3:5;28:25
**client (1)**
16:20
**close (7)**
4:13,24;14:21;
15:4;16:20;17:9;
18:7
**closely (1)**
14:8
**closing (5)**
5:19,21;14:25;
17:15;29:11
**collateral (1)**
12:15;29:4,7
**collect (2)**
24:10;25:10
**comfort (1)**
18:22
**comfortable (2)**
22:6;27:22

**comparison (1)**
27:1
**complain (1)**
28:10
**complete (1)**
15:25
**completed (1)**
27:5
**completely (3)**
12:7;15:7;17:17
**complicated (1)**
20:24
**concern (2)**
6:11;7:6
**concerned (3)**
8:11;24:21;29:17
**concerning (1)**
23:7
**concluded (1)**
30:11
**conclusion (1)**
4:22
**connection (4)**
8:18;11:1;20:2;
25:16
**consider (4)**
11:17;24:12;25:1,
1
**considerably (4)**
15:19;18:15;26:5;
27:6
**consideration (1)**
10:20
**considering (3)**
7:15;19:7,24
**consistent (1)**
14:12
**contact (1)**
28:24
**contemplated (2)**
15:7;20:4
**contemplating (8)**
5:18;6:15;7:18;
8:12;11:11;21:12,
19;22:7
**contested (1)**
25:10
**contingencies (1)**
12:22
**continue (1)**
26:12
**contract (39)**
3:22,24;4:1,3,6,6,
14,18;5:20;6:2,9,15,
18;7:15,19,24;8:18;
9:6,7,10,25;10:8,18;
11:2;13:14;18:11,12,
17;19:4,8;20:2,12;
21:10,20;22:10;
24:14,15;27:11;
29:25
**contracts (2)**
5:25;30:1

**contract's (1)**
6:1
**cooperative (1)**
16:17
**core (1)**
29:22
**couple (1)**
28:16
**course (1)**
14:14
**COURT (87)**
3:1,7,8,16;4:8,14,
17,25;5:4,10,13;6:5,
21;7:3,6,20,23;8:17,
20,23;9:4,17;10:1,7,
11,16,17,24;11:12,
15,20,21;12:2;13:18,
22,25;14:5,12,15;
15:19;17:19,24;18:6,
8,10,15,19,21;19:20;
20:1,4,9,23;21:5;
22:5,21;23:9,23;
24:9;25:5,11,14,21;
26:5,10,15,18;27:4,
9,16,17,21,23;28:6,8,
12,17,22,24;29:3,15,
17,23;30:2,7,9,9
**Court's (2)**
10:16;26:8
**credit (14)**
5:6,16,21;7:14;
8:18,21;12:11,12,13;
14:1;19:23;21:6;
22:1;25:16
**creditors (2)**
8:10;23:21

**D**

**damage (1)**
19:10
**damages (27)**
6:9,14;7:4;8:11;
9:2,9;10:25;11:13;
13:13,16,19;15:12,
16,17;18:12,24,25;
19:21;20:1,12;21:7;
22:22;24:16;26:1,5,
25;27:10
**day (2)**
25:12,13
**dealing (3)**
7:13;25:9,9
**debt (3)**
5:8;10:6;16:14
**debtors (7)**
9:11;11:7;12:20;
16:8,17,25;19:18
**decide (1)**
8:1
**decision (1)**
22:19
**deeply (1)**

23:7
**default (3)**
5:17,25;9:2
**defaulted (2)**
6:2;9:24
**defined (1)**
19:18
**depending (1)**
19:11
**deposit (13)**
3:25;4:15,20;5:7,
8,10,11;9:8,9;12:19;
13:10,11;25:17
**deposits (1)**
21:13
**desire (1)**
16:3
**determining (1)**
29:13
**deviating (1)**
14:7
**deviations (1)**
20:25
**difference (3)**
13:23;23:23;24:14
**different (3)**
15:5,8;17:1
**difficult (2)**
25:6,24
**diligence (1)**
20:16
**dime (1)**
4:23
**discovery (1)**
7:10
**discuss (1)**
14:11
**discussed (1)**
14:20
**discussions (1)**
13:4
**docket (1)**
29:3
**dollar (2)**
4:10,21
**dollars (3)**
6:24,25;21:25
**Donaldson (3)**
23:10,12,14
**done (3)**
12:21,24;21:14
**door (4)**
3:12;4:5,12;9:14
**down (6)**
4:5;6:12;8:7;26:18
**due (1)**
20:16
**duties (1)**
28:13

**E**

**easily (1)**

19:10
**eat (1)**
15:18
**effect (1)**
22:15
**effort (1)**
21:22
**either (1)**
11:13
**else (4)**
10:19;11:6,7;
25:23
**e-mails (2)**
28:2,16
**end (4)**
7:9;25:12,13;
29:10
**enough (3)**
16:14;21:1;22:8
**enter (5)**
4:2;6:16;19:4,25;
21:20
**entered (3)**
12:11;14:13;29:10
**entering (1)**
22:10
**entire (1)**
15:18
**entireties (3)**
8:5,5,7
**entitled (1)**
10:20
**escrow (2)**
4:11,23
**especially (1)**
13:14
**establish (1)**
15:3
**estate (15)**
4:24;6:1,2,9;8:10;
9:25;11:10;19:5;
20:5,18;21:25;23:17,
20;24:1,10
**estate's (1)**
22:22
**et (3)**
17:14,14,14
**even (2)**
10:8;11:16
**event (2)**
4:24;6:8
**everybody (3)**
10:19;11:6;25:23
**everyone (1)**
11:7
**evidence (3)**
21:15;22:9;26:22
**exact (1)**
15:14
**exactly (1)**
19:13
**example (1)**
15:1

**exceed (2)**
18:24;19:10
**excepted (1)**
12:20
**excess (4)**
5:8,13,14;24:18
**exchanging (1)**
28:2
**exclude (1)**
10:15
**excuse (3)**
3:10;6:25;23:12
**execute (1)**
4:6
**exercising (1)**
22:2
**existing (1)**
10:8
**expect (1)**
14:24
**expend (1)**
21:25
**expense (2)**
21:22;25:9
**expensive (1)**
17:13
**expires (1)**
29:7
**exposed (1)**
13:19
**exposing (1)**
13:15
**extent (1)**
28:9
**extremely (1)**
7:17

**F**

**facing (1)**
18:16
**fact (2)**
15:9,13
**factors (1)**
25:2
**facts (1)**
16:3
**fail (5)**
4:5,6,12,13,24
**faith (3)**
19:9;21:16;22:12
**far (4)**
22:8;24:24;25:18;
29:17
**feel (2)**
18:23;22:6
**felt (1)**
22:3
**Fidelity (2)**
4:11;23:19
**fiduciaries (1)**
3:19
**fiduciary (6)**

6:13;7:13,17;
19:14;22:4;28:13
**file (5)**
5:20;6:7;16:4,6,14
**filed (2)**
17:7,24
**filing (4)**
19:7,24;25:9;
29:20
**fill (1)**
3:24
**final (1)**
11:9
**finalize (1)**
3:21
**fine (3)**
12:2;16:18;27:25
**First (8)**
3:11;7:8,22;11:24,
24;12:6,10;16:4
**five (6)**
4:4,9;5:13;11:8,9;
23:15
**five- (1)**
13:9
**five-percent (1)**
9:13
**fix (1)**
8:3
**flexibility (2)**
16:19,23
**floating (1)**
28:18
**following (1)**
28:13
**foreclose (2)**
5:21;16:22
**forfeit (5)**
4:7,8,15;9:9;24:19
**forfeiting (1)**
21:12
**forfeiture (1)**
24:5
**form (5)**
3:24;19:16,17;
20:17,25
**forth (2)**
12:11;24:3
**forward (2)**
10:14;22:11
**fought (1)**
21:24
**full (1)**
22:10
**function (1)**
14:20
**funds (1)**
24:2
**further (1)**
30:3

**G**

**gatekeeping (1)**
14:20
**gives (1)**
8:16
**Good (6)**
3:6,7;25:8;26:2;
27:18;30:2
**grant (1)**
18:5
**greater (1)**
18:25
**guess (4)**
9:4;15:17;21:5;
22:8
**guidance (4)**
3:21;11:20;21:2;
30:3

**H**

**hand (1)**
23:19
**happen (4)**
6:11;16:1;26:20;
29:18
**happened (2)**
18:1,6
**happening (1)**
16:11
**happens (3)**
5:15;19:11;29:13
**happy (2)**
12:2;28:22
**hard (4)**
8:7;11:8;13:14;
21:24
**heading (1)**
23:24
**heard (1)**
11:25
**hearing (7)**
11:24;16:5;17:5;
22:13;27:15;28:25;
29:4
**held (1)**
17:5
**high (16)**
4:13,22;5:16,18;
6:16,18;9:15;13:10;
14:21;15:5;16:21;
17:4,8;19:5;25:3;
29:23
**higher (1)**
7:7
**hit (1)**
3:17
**hold (1)**
16:18
**holder (6)**
9:11;10:12;12:13;
19:16;21:6;24:16
**holders (18)**
3:19;4:4;5:6,16;

8:7;18:11,25;19:19;
20:6;22:7,22,23;
23:4;24:24;25:22;
26:19;27:6,12
**holder's (2)**
12:15;24:15
**holding (1)**
8:4
**Honor (40)**
3:6,13,21;6:17;
7:1,23,24;8:15;
11:23;12:5,8,11;
13:8,8,21;15:14,24;
16:5;17:3,6,18,22;
18:4,14,18;19:2,12;
23:2,12;27:8,14,20,
24;28:15,20;29:2,16,
25;30:6,8
**Honorable (1)**
3:3
**Honor's (1)**
28:4
**hope (2)**
27:5;29:6
**hours (3)**
4:19,22;9:15
**hundred (1)**
14:9

**I**

**identify (1)**
12:21
**III (1)**
3:10
**immediately (1)**
16:3
**impair (1)**
20:18
**important (2)**
5:17;13:7
**include (4)**
6:19;7:23;8:24,25
**including (1)**
6:7
**incorporating (1)**
29:8
**incorrect (1)**
17:17
**increase (2)**
9:14;21:6
**increases (1)**
4:2
**independent (1)**
24:1
**indicated (2)**
22:11;24:25
**indication (1)**
15:2
**individual (1)**
8:4
**initial (1)**
12:19

**insisting (1)**
11:19
**instances (1)**
14:23
**instead (2)**
5:19,21
**institutional (1)**
20:15
**intend (3)**
19:4;22:10,12
**intent (2)**
24:25;26:21
**intention (1)**
21:16
**intentions (1)**
22:24
**interest (1)**
27:4
**interests (1)**
16:20
**interim (1)**
19:12
**interpreted (1)**
17:25
**into (9)**
6:16;8:1;19:4;
21:16,20,22;22:10,
12;23:19
**investor (1)**
20:15
**inviting (1)**
9:12
**irrevocable (1)**
12:24
**issue (15)**
3:14;5:5,15;6:17;
10:10,22;11:6;12:6,
6;13:14;15:24;
16:12;23:10;27:7;
28:8
**issues (1)**
3:20

**J**

**January (2)**
17:16;29:11

**K**

**keeping (1)**
29:8
**Keith (1)**
3:3
**kind (1)**
22:3
**knowing (1)**
6:11

**L**

**language (2)**
28:1,19

**largely (1)**
14:20
**larger (1)**
6:23
**last (2)**
16:13;29:9
**law (3)**
6:3;8:15;9:24
**lay (1)**
3:20
**LC (3)**
3:5,9,10
**leases (1)**
29:22
**least (5)**
3:18;5:24;8:8;
15:16;26:11
**less (1)**
17:13
**liability (3)**
6:19;7:18;13:9
**liable (2)**
9:2;13:13
**liens (1)**
23:20
**liked (1)**
13:5
**likely (1)**
15:19
**limit (3)**
5:16;22:22;24:16
**limitation (2)**
7:18;13:8
**limited (3)**
7:4;15:21;25:22
**limits (2)**
6:19;19:21
**LLC (1)**
3:10
**look (1)**
17:6
**looking (2)**
22:1;23:8
**lose (3)**
3:15;4:25;19:11
**lot (3)**
9:16;20:13,16
**loud (1)**
26:19
**Luzinski (1)**
23:14

## M

**makes (1)**
17:12
**making (1)**
10:25
**mark (1)**
14:3
**material (4)**
14:6,16;20:15,18
**May (25)**

3:8;4:2;7:12;11:5;
12:13;16:6,14,19;
17:1;19:18;20:5,25;
21:10,12;22:13;23:5,
8;24:1,22;25:15;
26:10,20,20,20;
27:12
**maybe (5)**
10:23;11:21;
14:23;21:11;22:1
**mean (22)**
8:25;9:3,4,19;
10:24;11:5;13:22;
14:5,15;15:1,10;
17:19;18:2,5,9;20:4,
9,23;21:11;22:18;
23:19;24:4
**means (1)**
18:4
**mid- (1)**
3:1
**midst (1)**
3:12
**might (10)**
9:25;11:1;15:21;
17:25;21:7;24:12,
19;25:1;27:1;28:9
**million (6)**
6:22,24,24;9:20;
26:2,2
**mischaracterization (1)**
15:25
**mischaracterizes (1)**
12:7
**mistake (1)**
21:13
**moment (1)**
12:9
**momentum (1)**
3:15
**Monday (1)**
17:7
**money (7)**
8:7;9:16;11:8;
23:18,20,22;25:7
**month (1)**
29:10
**more (11)**
9:18;14:24;15:19;
17:14;18:15;22:6,
25;25:24;26:6;27:6;
28:24
**morning (1)**
10:10
**most (1)**
25:23
**motion (14)**
5:20;6:7;16:4,6,
15;17:4,8,24;19:7,
24;27:16,20;29:14,
20
**much (4)**
20:24;27:15;

28:21,25
**must (1)**
3:24

## N

**National (1)**
4:11
**need (12)**
3:13;10:8;14:12;
18:22;22:19;25:13,
13;27:19,21;28:21,
24;30:3
**needed (1)**
28:1
**negotiated (1)**
20:21
**negotiating (3)**
5:23;8:17;19:15
**negotiation (3)**
9:5;13:6;15:7
**negotiations (1)**
20:14
**Nevertheless (1)**
21:11
**next (1)**
3:12
**nickel (3)**
4:10,21;5:1
**noncommittal (1)**
16:24
**noncredit-bid (1)**
4:3
**none (3)**
11:10,12;15:10
**Nonetheless (2)**
16:12;17:2
**notice (2)**
11:25;12:1

## O

**objection (2)**
6:13;7:10
**obligation (1)**
24:5
**obviously (1)**
14:15
**off (2)**
16:18;21:23
**offer (2)**
22:25;26:3
**offering (1)**
25:25
**offers (1)**
22:16
**OFFICER (2)**
3:1;30:9
**offset (1)**
24:9
**once (1)**
24:13
**one (8)**

6:22;10:15;11:16;
16:25;20:8,14,20;
26:17
**onerous (1)**
9:13
**ongoing (1)**
7:11
**only (3)**
13:23;14:4;20:2
**open (1)**
8:4
**opportunity (3)**
14:3;17:10,12
**opposed (2)**
11:18;26:25
**option (1)**
11:5
**order (21)**
3:4;4:5,9,11;5:6,
20;8:14,21,21;12:11,
16,16;15:14;18:3,22;
19:15,16;22:6;
26:11;27:21;29:9
**orders (3)**
6:5;8:15;14:13
**ordinarily (1)**
9:1
**otherwise (2)**
6:5;8:16
**out (13)**
3:20,24;13:18;
16:9;19:7,24;22:2;
23:5,8,22;26:19;
27:7;29:22
**over (4)**
3:12;11:19;20:20;
28:23
**owed (2)**
9:20;27:6

## P

**package (1)**
3:23
**part (1)**
13:2
**particular (1)**
28:8
**particularly (1)**
21:21
**parties (3)**
8:6;17:13;29:22
**parts (2)**
13:3,3
**party (11)**
7:13;8:11;14:21;
15:3;19:15;20:15;
21:24;23:7,15;25:7;
27:5
**past (1)**
25:18
**pay (1)**
23:21

**payment (1)**
29:9
**pending (2)**
7:10;17:4
**percent (22)**
4:4,9,19,20;5:13,
14;9:14,18;11:8;9;
13:10,11;14:9;15:22,
23;18:16;19:21;
21:8;23:15;24:6;
25:22;26:6
**performing (1)**
21:19
**permission (1)**
21:3
**Phillips (1)**
3:3
**piece (1)**
9:1
**place (5)**
9:6,8;10:1,3,18
**Please (2)**
3:3,8
**plus (1)**
23:18
**PM (1)**
30:11
**point (13)**
3:18;5:25;13:17;
14:22;15:6;18:6;
20:8,14;21:15;22:8;
23:13;24:12;25:19
**portfolio (2)**
8:8,9
**portion (1)**
15:15
**portions (1)**
12:14
**position (2)**
10:13;17:2
**possibility (4)**
16:6;21:10;22:13;
24:22
**possibly (2)**
15:17;25:23
**post (2)**
4:10;9:8
**potential (7)**
11:1;18:12,23;
21:7;22:16;27:11;
28:6
**potentially (5)**
17:25;18:16;
21:12;22:24;24:6
**prepared (1)**
29:7
**presented (1)**
12:8
**presiding (1)**
3:3
**presumably (1)**
17:7
**pretty (5)**

9:13;14:10;26:2,
25;28:25
**prior (1)**
29:8
**probably (2)**
24:23;29:20
**problem (1)**
25:14
**procedures (8)**
12:12,16,17,17,18;
15:8;18:4;19:18
**proceed (1)**
27:25
**proceedings (1)**
30:11
**process (3)**
12:3;16:7;26:24
**prohibits (1)**
13:15
**properties (4)**
8:4;12:14,21;
29:21
**property (6)**
4:1;9:1;19:5;
23:18;25:8;30:1
**proposed (1)**
5:24
**prospective (1)**
12:14
**protect (2)**
4:23;11:9
**protection (3)**
8:16;10:4;29:9
**protects (1)**
26:11
**provided (1)**
8:13
**provides (2)**
4:3;9:8
**provision (4)**
6:5,19;7:24;15:9
**provisions (4)**
5:23;8:23;13:5;
29:9
**purchase (3)**
4:1;19:5,17
**purchaser (4)**
13:19;15:5,20,21
**put (15)**
4:4,10,21;5:7;
6:13;9:13,13,19,21;
11:7,9;13:5;15:9;
21:22;23:15
**puts (2)**
8:3;25:6
**putting (5)**
9:16;11:11;13:25;
23:25,25

## Q

**quickly (3)**
3:13,20;16:6

## R

**Rahman (25)**
11:22,23;12:4;
13:20,24;14:2,8,14,
18;15:23;17:22;
18:2,7,9,14,18,20;
27:19,22,24;28:3,15,
18;29:12;30:8
**raise (2)**
4:19;23:14
**raised (2)**
16:5,12
**rather (1)**
16:20
**reach (2)**
10:13;14:22
**readily (1)**
30:3
**ready (1)**
28:5
**real (3)**
6:2;8:3;9:24
**really (3)**
6:17;14:16;18:23
**reason (4)**
5:17;9:7;11:21;
13:7
**reasons (1)**
11:23
**recognized (1)**
13:8
**record (2)**
19:6;28:9
**reflects (1)**
29:3
**release (1)**
20:4
**relevant (1)**
14:10
**relief (10)**
5:20;6:7;16:4,7,
15,22;17:7,24;18:5,5
**remedies (4)**
6:2;8:14;9:24;10:4
**remind (1)**
29:17
**Renaissance (3)**
3:5,9,10
**representing (1)**
8:10
**requested (1)**
20:16
**require (1)**
26:24
**required (3)**
5:10,12,15
**requirement (3)**
5:7;9:13;25:17
**requirements (1)**
12:18
**requires (1)**

27:20
**resell (2)**
23:18;25:8
**resolve (1)**
10:10
**resolved (1)**
29:5
**respect (1)**
19:20
**respond (1)**
29:14
**restarted (1)**
3:15
**restriction (1)**
14:4
**resulting (1)**
20:12
**return (1)**
3:25
**reviewed (1)**
14:8
**Right (12)**
4:16;9:4,19;10:1;
11:13;14:1;15:4;
18:19;21:18;25:11;
30:2,7
**rights (5)**
6:1;19:23;22:1,2;
25:18
**rise (1)**
30:9
**risk (1)**
9:16
**River (3)**
3:5,9,9
**road (1)**
6:12
**Robert (1)**
3:8
**room (1)**
3:17
**rule (2)**
7:25,25
**ruling (4)**
3:13;26:9,10;28:4
**run (1)**
26:9
**running (1)**
21:21

## S

**sale (33)**
3:12,14,22,24;
4:12;8:13,20;12:16,
22;14:17,22;15:4,8;
16:20;17:5,9,11;
18:3,3;21:17;22:15,
20;26:12,15,16,17;
27:5,25;28:7;29:5,
17,21;30:1
**sales (1)**
29:11

**same (3)**
10:18;13:23;28:19
**sat (1)**
16:10
**satisfied (1)**
15:16
**satisfy (1)**
16:14
**saying (3)**
9:22;21:9;25:22
**scenario (1)**
22:3
**scheduled (1)**
29:1
**scope (1)**
8:20
**seated (1)**
3:3
**Second (2)**
7:12;15:24
**seconds (1)**
28:15
**secured (1)**
24:7
**seek (5)**
6:9;9:23;11:19;
16:22;29:25
**seeking (2)**
5:19;19:7
**seems (3)**
13:22;24:17;26:2
**seller (2)**
6:2;9:24
**sense (1)**
17:13
**sentence (1)**
3:2
**separate (3)**
24:5,6;25:17
**serve (1)**
12:15
**session (1)**
3:2
**setoff (3)**
24:1,2;25:17
**sets (1)**
12:11
**several (1)**
11:23
**shall (1)**
19:16
**shared (1)**
17:2
**short (2)**
11:24;12:1
**showed (1)**
14:3
**sign (7)**
4:6,18;6:18;11:2,
3;24:15,16
**signal (1)**
24:22
**signaled (2)**

21:9;26:21
**signaling (1)**
23:8
**significant (2)**
21:1;27:1
**signs (1)**
7:15
**similar (1)**
19:17
**simply (3)**
9:22;13:16;18:4
**single (1)**
13:6
**singled (1)**
13:18
**sit (1)**
19:13
**situation (1)**
12:8
**six (1)**
26:2
**small (1)**
8:8
**smaller (1)**
6:25
**somebody (2)**
28:9,12
**somehow (3)**
22:14,15,24
**sometime (1)**
17:16
**soon (1)**
29:15
**sorry (1)**
23:11
**sort (2)**
14:19;15:17
**sounds (1)**
30:2
**speak (1)**
15:24
**special (5)**
10:20;12:4,10;
13:7;21:21
**special-purpose (1)**
15:3
**spent (1)**
20:16
**spoken (1)**
12:5
**spot (1)**
25:6
**standpoint (1)**
24:20
**State (1)**
3:2
**stay (9)**
5:20;6:7;16:4,7,
15,22;17:7,24;18:5
**still (9)**
16:10,11,19;18:7;
23:17,17;25:3,5,21
**straight (1)**

Case 14-34080-KLP    Doc 276    Filed 12/22/14    Entered 12/22/14 14:27:14    Desc Main
RIVER CITY RENAISSANCE, LC, et al.
Case No. 14-34080-KLP                    Document    Page 37 of 37

December 18, 2014

**28:14**
**stranger (1)**
    11:7
**strangers (1)**
    9:10
**strategies (1)**
    22:14
**streamlined (1)**
    17:14
**stricken (1)**
    13:2
**strikes (1)**
    7:16
**stripped (1)**
    13:2
**struggling (1)**
    21:5
**subject (8)**
    4:2;15:7,11,21;
    18:25;21:8;23:20;
    29:11
**submit (3)**
    12:12,13;14:4
**submitted (5)**
    5:22;13:1;15:1;
    19:16;21:1
**substantially (1)**
    19:17
**suit (2)**
    25:9,10
**supposed (1)**
    29:18
**sure (5)**
    10:22;23:1;25:1;
    28:17,18

**T**

**talk (3)**
    12:6,9;23:10
**talking (1)**
    28:19
**tangible (1)**
    22:9
**telling (2)**
    17:20;21:14
**ten (14)**
    4:19,20;5:14;9:14,
    18;15:22,23;18:15;
    19:21;21:8;23:15;
    24:6;25:22;26:6
**ten- (1)**
    13:10
**ten-percent (1)**
    24:18
**tens (1)**
    21:25
**term (2)**
    3:22;10:15
**terminated (1)**
    6:1
**termination (1)**
    29:11

**terms (10)**
    8:17;10:8,20;
    12:16;14:5,6,10,16,
    22;26:12
**there'll (1)**
    20:24
**thereof (1)**
    12:14
**thinking (3)**
    21:14;25:1;26:19
**thinking-out-loud (1)**
    26:24
**third (2)**
    23:14;27:5
**third-party (1)**
    15:20
**thirty-one-whatever (1)**
    26:1
**thought (1)**
    23:24
**thousands (1)**
    21:25
**three (2)**
    8:6,8
**Title (1)**
    4:11
**today (3)**
    14:3;16:11;21:20
**told (8)**
    5:18;11:10;16:2,
    14;19:23;21:19;
    23:5;29:12
**tomorrow (3)**
    17:7;29:19,20
**transaction (1)**
    20:24
**treated (1)**
    13:23
**treatment (2)**
    12:4,10
**true (1)**
    20:19
**trust (1)**
    13:15
**trustee (6)**
    14:15;22:6;24:21;
    26:11;27:12;28:12
**try (2)**
    10:16;23:22
**trying (4)**
    10:10,11,13;22:2
**turn (1)**
    27:7
**twenty (2)**
    9:20;28:15
**twenty-eight (1)**
    6:21
**twenty-four (4)**
    4:7,19,22;9:15
**twenty-six (2)**
    6:21;26:1
**type (3)**
    18:22;21:2;26:24

**types (1)**
    16:8

**U**

**under (9)**
    5:6;6:3;7:16;8:15;
    9:17,24;10:20;
    12:12;24:17
**understood (1)**
    17:1
**undisputed (1)**
    15:15
**unless (4)**
    5:8;6:5;8:15;27:20
**unlimited (5)**
    13:13,16,19;
    15:11;26:24
**unrelated (1)**
    15:20
**unusual (1)**
    15:10
**unwise (1)**
    7:17
**up (14)**
    4:21;5:7,12;7:9;
    11:8,9;13:25;14:3,3;
    15:6;23:15,25,25;
    25:15
**upon (1)**
    29:11
**upside (1)**
    16:8
**use (3)**
    9:6;10:18;26:23
**uses (1)**
    10:19

**V**

**vehicle (1)**
    15:4
**version (1)**
    14:4
**viewed (1)**
    14:19
**Virginia (1)**
    3:2

**W**

**waiting (2)**
    8:5;20:20
**wants (2)**
    23:10;24:16
**way (8)**
    12:7;14:18,19;
    16:25;17:3;20:19;
    23:16;24:18
**week (2)**
    16:13,15
**What's (3)**
    4:8;10:18;16:11

**Whereas (1)**
    23:21
**Whereupon (1)**
    30:11
**who's (1)**
    21:6
**willing (2)**
    8:25;21:6
**windfall (1)**
    23:16
**Within (4)**
    4:7,22;5:16;9:15
**wondering (2)**
    9:5;15:17
**written (2)**
    27:16,20

**Y**

**yield (1)**
    16:8

**1**

**12/31 (1)**
    29:7
**12:34 (1)**
    30:11

**2**

**23rd (4)**
    17:6;29:1,18,25

**3**

**31.3 (2)**
    6:24,24
**31.4 (1)**
    6:24

**6**

**6.6 (2)**
    6:25;7:1
**6.7 (1)**
    7:1